# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. CR409-163 |
| ) | |
| CARLOS MORALES ) | |

## REPORT AND RECOMMENDATION

Defendant Carlos Morales, charged with one count of Social Security Fraud, 42 U.S.C. § 408(a)(4), moves the Court to suppress the statements he made to government agents who investigated him. Doc. 20. He contends that his statements were not voluntary. *Id.* The government opposes his motion. Doc. 33. The Court conducted a *Jackson v. Denno*, 378 U.S. 368 (1984), hearing on December 2, 2009.[1]

## I. FACTS

At the hearing, the government called just one witness -- Michael Schexnayder, a Special Agent for the Social Security Administration's Office of the Inspector General. Schexnayder testified that he and

---

[1] Morales also alleged a *Miranda* violation, *see Miranda v. Arizona*, 384 U.S. 436 (1966), doc. 20, but abandoned that claim during the hearing.

another agent twice visited Morales's Savannah, Georgia home to investigate allegations that Morales was working while collecting social security disability benefits. At the first (February 25, 2009) interview, both men identified themselves to Morales as federal agents, and Schexnayder told him that he was there to investigate Morales's receipt of benefits. Morales agreed to speak with Schexnayder and invited the agents into his home. Schexnayder then told Morales that he had received an allegation that Morales had been working.[2] When Morales denied that he was working, Schexnayder told him he had information that Morales was operating "Karlito's Ink," a tattoo parlor, at that residence.

Morales at first claimed his brother operated Karlito's. After Schexnayder showed him a multi-page printout of Morales's "MySpace Page" depicting a photo of him operating the business, Morales admitted that in fact it was his business and that he had been operating it. Morales then showed the agents his tattoo parlor, situated inside of his home. All four walls were covered with tattoo designs. There was a

---

[2] Schexnayder testified that recipients were only permitted to earn up to $980 per month in 2009 without forfeiting disability benefits.

drawing board, a leather chair, ink samples, needles, paper towels, gloves, gauze, and other trappings of such a business. Morales showed Schexnayder around the room. They talked about defendant's designs on the walls. When asked about the daily operation of the business, Morales told the agent about the number of customers per day, the length of time that it took to do each tattoo, that he was open up to 7 days a week, and that he typically collected $40-$50 per tattoo, in cash. Finally, since it was a cash-only business, Morales kept no records, except that he had recently begun keeping an appointment book which he showed to Schexnayder.

Morales also revealed that he advertised his business by word of mouth, through his MySpace page, and with the use of flyers. In fact, he gave Agent Schexnayder a flyer to keep. The flyer identifies "Carlos" as the operator of the business. *See* Gov't's Ex. 2. Morales told Schexnayder that the social security payments that he had been receiving were simply not enough to makes ends meet, so he needed to do something else.

Schexnayder informed Morales that it was part of his job to document the encounter. He told him that he could generate a report on

his own, but that Morales had the option of completing a written statement and thus objecting to and correcting any inaccuracies on the spot. Morales chose the statement option and asked Schexnayder to write it out for him. Schexnayder then asked, and Morales confirmed, that Morales reads and writes in English. Government Exhibit 1 is Morales's written statement.[3]

After Morales signed the statement, Schexnayder told him that he was still investigating him and would turn over all of the information to the Social Security Administration, which would determine whether he remained eligible for benefits. Throughout the entire 30-35 minute encounter, Morales never asked to stop or to consult with anybody (even though he mentioned that his brother was in a back room of the house). Schexnayder made no promises or threats and did not arrest Morales. Schexnayder also did not sense that Morales was in any way mentally impaired or under duress. And, he discerned no visible tics, odd

---

[3] To generate it, Schexnayder used what he called the "line-by-line method." He first verbally confirmed the information with Morales, then wrote the sentence down. After he completed the entire statement, Schexnayder went back to the first page and reviewed each statement orally with Morales, and then invited and made Morales's corrections. He also had the Morales initial each correction. Exhibit 1 reflects those corrections. Morales signed the statement after Schexnayder put him under oath.

mannerisms, stress, confusion, or nonsensical answers.

The agents returned to Morales's home on June 18, 2009, for a follow-up interview. Morales confronted Agent Schexnayder with a disability benefits termination letter that he had received. Schexnayder said that he was unaware of the letter, but Morales challenged him on that. Schexnayder invited Morales to show it to him, and they talked about the letter together. Schexnayder told Morales that during the first interview he had neglected to ask Morales about his business expenses, since they are something that the Social Security Administration (SSA) takes into account in determining income limits (i.e., business revenue less actual expenses determines actual profits).

In response, Morales outlined some of his monthly expenses, including what he spent on gloves, paper towels, ink, and needles. The agents then asked Morales if they again could see his tattoo parlor, and Morales showed it to them. The room appeared to be exclusively used for his business. He also let agent Schexnayder take photos of the room. This visit lasted approximately 15 minutes. As the agents left, Morales said that he knew he had "done wrong" and expected the SSA to terminate his disability benefits.

Schexnayder did not review any of Morales's medical records before interviewing him. However, Morales did not seem confused, stressed, or mentally impaired. Nor did he ask to speak to anyone else, let alone a woman who, with children, had entered the house around the same time that the agents did. And, Morales requested no breaks for food, water, or to rest.

On cross-examination, Schexnayder admitted that he did not inform Morales that he did not have to speak with the agents. Nor did Schexnayder tell Morales that if he felt uncomfortable, he could summon someone else to be there. Finally, Schexnayder never told Morales that he was free to terminate the interview or advise him that he could have a lawyer present if he wanted one. He did, however, warn Morales about possible legal ramifications if he lied or made false statements to federal agents, and he denied ever telling Morales that he was there to "help him" work through Social Security benefit issues.

## II. ANALYSIS

Involuntary, coerced confessions violate the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) (citations omitted). Such coercion can be mental or

6

physical. *Connelly*, 479 U.S. at 164-65; *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960); *Chambers v. Florida*, 309 U.S. 227, 237-38 (1940) ("The rack, the thumbscrew, the wheel, solitary confinement, protracted questioning and cross questioning, and other ingenious forms of entrapment of the helpless or unpopular had left their wake of mutilated bodies and shattered minds along the way to the cross, the guillotine, the stake and the hangman's noose.").

In determining whether a confession is voluntary, courts look to the "totality of the circumstances." *Blackburn*, 361 U.S. at 206 (citing *Fikes v. Alabama*, 352 U.S. 191 (1957)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quotes and cite omitted); *see also United States v. Gohn*, 2009 WL 112814 at * 3 (S.D. Ga. Jan. 16, 2009).

The bottom line to the Court's inquiry, then, is whether any coercion has been employed. *Connelly*, 479 U.S. at 165 (there must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other."). Thus, if a

7

man's conscience, deity, or addled mind compels him to confess something incriminating to the police, the Due Process clause is not violated -- because no *governmental* coercion has been employed. *Id.* at 166-67. This is different from a Fifth Amendment *Miranda*-based analysis, which imposes knowing and intelligent waiver requirements. *Miranda* only applies to *custodial* interrogations, which present a more inherently coercive environment. *See Smith v. Zant*, 887 F.2d 1407, 1428 (11th Cir. 1989). Again, Morales advances no Fifth Amendment claim here.

This case comes nowhere near the coercion-based threshold. The government's straightforward presentation shows that Agent Schexnayder employed a simple, non-coercive interview method, and gently nudged aside Morales's blatant lie (that the tattoo parlor was not his business) with documentary proof (Morales's Facebook page). In contrast to *Miranda*-based, Fifth Amendment claims, there was no duty on Schexnayder's part to ensure that Morales understood his right to remain silent, much less that Morales could consult another (e.g., counsel), or that he knowingly and intelligently waived his right to do both. The only issue here is whether, under the Due Process clause,

Schexnayder employed coercion to extract defendant's statements. The above-described, back-and-forth question and answer process, and enlisting Morales's cooperation in generating the agent's written report, shows that he did not.

## III. CONCLUSION

Defendant Carlos Morales's motion to suppress (doc. 20) therefore should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 17th day of December, 2009.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA